UNITED STATES of America,
Plaintiff-Appellee,

v.

Bradford S. TAYLOR,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Vincent Carmen PINTO,
Defendant-Appellant.

Nos. 85–1274, 85–1278.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 1986.

Decided Oct. 16, 1986.

James W. Erbeck, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff-appellee.

Lorriane J. Mansfield, Mark B. Bailus, Las Vegas, Nev., for defendant-appellant.

Before PREGERSON, POOLE and JOHN T. NOONAN, Jr., Circuit Judges.

POOLE, Circuit Judge:

This case involves the frustrated attempt by several individuals to sell up to $16 million of stolen blank corporate bonds to an undercover FBI agent. As a result of this attempt, Vincent Carmen Pinto was tried and convicted of transporting stolen securities in interstate commerce in violation of 18 U.S.C. § 2314, possessing goods or chattels stolen from interstate shipment in violation of 18 U.S.C. § 659, and conspiracy to commit these two offenses in violation of 18 U.S.C. § 371. Bradford S. Taylor was also tried on these charges but was convicted only on the conspiracy charge. Both appellants challenge their convictions on various grounds.

### FACTS AND PROCEEDINGS

In 1973, a blank bond issue for $25 million by A.C.F. Industries, Inc. was consigned to Emery Freight Co. in New York City for air shipment by National Air Lines to Baltimore, Maryland. The bonds, shipped by a financial printer to A.C.F. Industries, were complete except they lacked serial numbers, the names of the registered bond holders, and the signature of the assistant corporate trust officer. When the container arrived in Baltimore and was opened, the bonds were discovered missing.

Approximately twelve years later, in Las Vegas, Nevada, appellant Taylor and co-defendant Harold Szelap contacted Dennis Thomas, a stockbroker, to inquire whether Thomas had connections who would be interested in purchasing $22–25 million dollars in corporate bonds. At this meeting, Taylor showed Thomas a photocopy of one of the stolen A.C.F. Industries bonds. Appellant Vincent Pinto later met with Thomas and told Thomas that he possessed the bonds. Taylor was present at this meeting.

Thomas contacted the FBI and informed the agents of the offer. Cooperating with the FBI, Thomas gave Pinto the name of undercover agent Rick Baken as a potential purchaser of the blank bonds. Pinto contacted Baken and told Baken that Pinto had more than $22 million of A.C.F. Industries bonds available for sale. Pinto claimed that the bonds were in New York City and requested that Baken supply him with $800 so he could have an associate fly to New York and retrieve the bonds. Baken agreed to provide the money and to purchase $16 million of the bonds for 11% of their face value. Pinto and Baken also agreed that Taylor and Szelap would be compensated by Pinto for arranging the introduction.

The next day, at the Barbary Coast Hotel and Casino in Las Vegas, Baken gave Pinto $800. After the delivery of the cash, codefendant Alex Omega was observed to approach Pinto and was overheard stating to Pinto, "We're going now." Pinto and Omega then left the hotel and casino together. Pinto later claimed that he lied to Baken about the bonds being in New York City, and that the truth was he only wanted the money so he could gamble it.

Several days later, Pinto met with agent Baken at Caesars Palace Hotel and Casino to continue negotiations for the sale of the bonds. Undercover agents observed Omega in the hotel and casino. Later that day, Pinto met Baken at a room in the hotel to finalize the sale. While this meeting was

going on, agents observed Omega waiting at the elevator landing area on the same floor. When Pinto produced $1 million of the stolen A.C.F. Industries bonds he was arrested. Omega thereafter was arrested, and a search of the briefcase he was carrying revealed scraps of paper containing telephone numbers and flight times between Las Vegas and New York.

The next day, Taylor was recorded in a telephone conversation with Thomas. During the conversation, Taylor, who was unaware of the arrests of Pinto and Omega, demanded his 1% commission for having helped set up the bond transaction. After this conversation, agents arrived at Taylor's home and arrested him.

Taylor and Pinto, as well as co-defendants Omega and Szelap, were indicted for conspiracy, 18 U.S.C. § 371, interstate transportation of stolen securities, 18 U.S.C. § 2314, possession of goods or chattels stolen from interstate shipment, 18 U.S.C. § 659, and aiding and abetting the above crimes, 18 U.S.C. § 2.

At trial, Pinto took the stand and testified that he came into possession of the bonds back in 1976 or 1977 as a result of his winning a $52,500 bet with a gambler and/or bookmaker named Frank Pappas. Pappas told Pinto he was in financial trouble and so paid his debt with twenty $50,000 face value blank A.C.F. Industries bonds. Because Pinto was in good financial condition, he put the bonds away. Later in 1984, Pinto's finances turned sour. He claims he then started making inquiries about selling the bonds. Soon he met with Baken. Pinto maintains that his statements about having $22–25 million of the bonds was just puffing and that the reason Omega accompanied him to Caesars Palace was to provide security in case Baken tried to rob him.

The jury found Pinto guilty of all charges, but it convicted Taylor only on the conspiracy charge. Both timely appealed.

## DISCUSSION

### 1. *Blank Bonds as "Securities"*

Taylor and Pinto both argue that their convictions should be reversed because the blank A.C.F. Industries bonds are not "securities" for purposes of 18 U.S.C. §§ 659 and 2314. Statutory interpretation is a question of law subject to *de novo* review. *Trustees of Amalgamated Insurance Fund v. Geltman Industries, Inc.*, 784 F.2d 926, 929 (9th Cir.1986).

### a. 18 U.S.C. § 2314

Section 2314 makes it a crime to transport in interstate or foreign commerce, any securities, of the value of $5,000 or more, knowing the securities to have been stolen. 18 U.S.C. § 2314.[1] The term "securities," as used in section 2314, is defined in section 2311:

> "Securities" includes any note, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate; valid or blank motor vehicle title; certificate of interest in property, tangible or intangible; instrument or document or writing evidencing ownership of goods, wares, and merchandise, or transferring or assigning any right, title, or interest in or to goods, wares, and merchandise; or, in general, any instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for,
>
> * * *
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

---

1. Section 2314 provides in pertinent part:
 Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; * * *

warrant, or right to subscribe to or purchase any of the foregoing, or any forged, counterfeited, or spurious representation of any of the foregoing.

18 U.S.C. § 2311.

■ Clearly, the definition encompasses a genuine corporate bond as well as a forged or counterfeited bond. Appellants argue that the statutory definition, however, does not cover genuine blank bonds that, when correctly filled out, would evidence corporate debt. They rely on *United States v. Jackson*, 576 F.2d 749 (8th Cir.), *cert. denied*, 439 U.S. 828, 858, 99 S.Ct. 102, 175, 58 L.Ed.2d 167 (1978), for support.

In *Jackson*, the Eighth Circuit held that genuine blank stock certificates did not fit within the definition of securities under section 2311. *Id.* at 755. The court observed that the blank certificates lacked several essential ingredients—the name of the registered owner, a transfer agent's signature, a counter-signature, and the punched-out spaces for the odd-lot certificates. *Id.* Noting that criminal statutes are construed strictly, the court found that the blank stock certificates were too far removed from the genuine to fall under the express terms of section 2311. *Id.* at 755–56.

The government does not attempt to distinguish *Jackson* or attack its reasoning. Instead, the government argues that the bonds are facially valid certificates and thus have the status of "securities" under section 2311. *See United States v. Urciuoli*, 575 F.2d 768, 769 (9th Cir.1978) (per curiam). In *Urciuoli*, this court held that the fact that the savings certificates, which had been validly issued by the Banco Popular de Puerto Rico, had been cancelled by the owner subsequent to their theft by the defendants did not alter their status as securities.

> There was nothing on the face of the Banco Popular de Puerto Rico certificates to indicate that they were invalid and could not be redeemed. Appearing to be valid, the certificates could have been transferred to an innocent purchaser who only later, upon an attempt to redeem them, would learn of their cancellation.

*Id.*

■ Contrary to the government's characterization, the bonds in this case are not facially valid. They lack three essential elements. The bonds have no serial numbers, they lack the name of the holder, and they are not signed by the assistant corporate trust officer. Until these three elements are provided, the bonds cannot be negotiated to a *bona fide* purchaser. *See id.* (the Banco Popular de Puerto Rico certificates did not disclose on their face that they had been cancelled, thus they could yet have been sold to an innocent purchaser as genuine securities). Nevertheless, we decline to follow the Eighth Circuit's reasoning, and we hold that the blank bonds in this case are securities within the meaning of the statute.

■ Our objective when interpreting a statute is to ascertain the intent of Congress and to give effect to legislative will. *Moorhead v. United States*, 774 F.2d 936, 940 (9th Cir.1985). We begin with the statute's language. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Absent a clearly expressed legislative intent to the contrary, the plain meaning of the statutory language is controlling. *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Section 2311 broadly defines the term "securities" to encompass a variety of financial instruments. Bonds are specifically mentioned in the list. Also included are any forged, counterfeited, or spurious representation of the enumerated instruments. The scope of the definition clearly evidences Congress' intent to broadly cover this area. *See United States v. Speidel*, 562 F.2d 1129, 1131 (8th Cir.1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 505 (1978). Despite this expansive definition, appellants argue that incomplete bonds which have not been marked or al-

tered do not fit within the statutory definition.

■ Although criminal statutes generally are construed strictly, our construction should not ignore the evident purpose of the enactment. *See United States v. Campos-Serrano,* 404 U.S. 293, 298, 92 S.Ct. 471, 474, 30 L.Ed.2d 457 (1971); *United States v. Hogue,* 752 F.2d 1503, 1504 (9th Cir.1985). Section 2314 not only makes it a crime to transport in interstate commerce stolen, converted, or fraudulently obtained securities, it also outlaws interstate transportation with fraudulent intent of falsely made or forged securities. Inclusion of these two situations in the same section evidences legislative concern with preventing fraud perpetrated by use of either genuine or counterfeit securities. In light of this purpose, we construe the term "bonds" as listed in section 2311 to include genuine blank bonds which with minor additions would appear as facially valid certificates. Such bonds clearly have a high potential for fraudulent use, and thus their inclusion in the statutory definition is consistent with the legislative purpose.

This construction also is consistent with our opinion in *United States v. Anderson,* 532 F.2d 1218 (9th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). There the defendants devised and carried out a scheme in which they caused genuine stock certificates to be issued in the name of fictitious shareholders. The stock certificates were complete except they lacked the signature in the blank space provided for the stock transfer agent. *Id.* at 1226. This court rejected defendants' argument that these certificates were not "securities" under section 2311. *See id.* at 1224–26. Although we did not elaborate on our reasoning, our view apparently was that the certificates

were counterfeit because the defendants caused the falsification of shareholder names. We cited a line of cases holding that incomplete counterfeit securities, which on their face are adequate similitudes of genuine securities, fit within the statutory definition. *Id.* at 1224–25.

The cases from other courts which we cited in *Anderson* concerned the potential for fraudulent use of such documents and focused on whether the "securities" bear a sufficient similitude that, after completion by the defendants, they would have been calculated to deceive a reasonably prudent and intelligent investor. *See United States v. Chodor,* 479 F.2d 661, 664 (1st Cir.), *cert. denied,* 414 U.S. 912, 94 S.Ct. 254, 38 L.Ed.2d 151 (1973); *United States v. Anderson,* 359 F.Supp. 61, 66 (D.C.Ark. 1973). In *Anderson,* we noted that the insertion of any signature in the blank space on the stock certificate would have enabled the certificate to have been transferred. 532 F.2d at 1226.

The bonds in this case were genuine blank corporate bonds. With minor and easy additions, they could appear facially valid. Consequently, the potential for their fraudulent use was as great as that *Anderson.* It was this evil that Congress sought to address in enacting the statute making it illegal to transport such stolen instruments in interstate commerce. Accordingly, we conclude that the genuine blank bonds in this case were sufficiently complete as to fall within the definition of "securities" under section 2311.

### b. 18 U.S.C. § 659

■ Section 659 makes criminal the possession of "goods" or "chattels" stolen while in interstate commerce. 18 U.S.C. § 659.[2] Count III of the indictment

---

**2.** 18 U.S.C. § 659 provides in part:
Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any * * * aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an

interstate or foreign shipment of freight, express, or other property; or
Whoever, buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen; * * *
* * *

charged the defendants with possessing "chattels of a value in excess of $100, that is, securities, ACF Industries, Incorporated, registered bonds, Cusip # 0008000 AK 8, Series B, with a due date of March 15, 1988 * * *." The blank bonds clearly fall within the broad category of "chattels." *See Jackson*, 576 F.2d at 756.

### 2. *Value of the Bonds*

Appellants contend that since the blank bonds in this case had never been issued by the corporation, their value is less than the jurisdictional minimum required for conviction under the statutes.

Section 2314 makes it a crime to transport in interstate commerce securities of the value of $5,000 or more, knowing the securities to have been stolen. 18 U.S.C. § 2314. "Value" is defined as the face, par, or market value, whichever is greatest, and the value of all securities referred to in a single indictment is aggregated for purposes of meeting the statutory minimum. 18 U.S.C. § 2311. Section 659, which criminalizes the possession of goods or chattels stolen while in interstate commerce, has no similar jurisdictional amount. However, unless the value of the stolen goods or chattels exceeds $100, the defendant can only be imprisoned for one year. In the indictment, appellants were specifically charged with conspiracy to possess, as well as possession of, securities of a value in excess of $100.

■■■ These bonds clearly met the $5,000 jurisdictional requirement of section 2314. Each of the twenty bonds seized from codefendant Pinto upon his arrest had a printed face value of $50,000. Face value is one measure of value for the purpose of satisfying the jurisdictional minimum under section 2314. In addition, agent Baken negotiated a sales price of 11% of the face

value for a total of $110,000. This aggregate cash amount establishes a market value (sometimes called a "thieves' market value") which also satisfies the jurisdictional minimum. *See United States v. Bell*, 742 F.2d 509, 511 (9th Cir.1984).[3]

The "thieves' market value" is also accepted as a proper means of appraising stolen goods or chattels under 18 U.S.C. § 659. *See Jackson*, 576 F.2d at 757. The "thieves' market value" here was $110,000, well above the $100 charged in the indictment.

### 3. *Sufficiency of Evidence*

This court reviews a challenge to the sufficiency of evidence for whether any rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could find the essential elements of the crime beyond a reasonable doubt. *United States v. Douglass*, 780 F.2d 1472, 1476 (9th Cir.1986).

■■■ Appellants contend that the government presented insufficient evidence that the co-conspirators knew the bonds were stolen. The bonds were "stolen" if they were "acquired or possessed, as a result of some wrongful or dishonest act or taking whereby a person wilfully obtains or retains possession of property which belongs to another, without or beyond any permission given, and with the intent to deprive the owner of the benefit of ownership." *Anderson*, 532 F.2d at 1227. Knowledge that the securities had been stolen is an essential element for conviction under 18 U.S.C. § 2314, *id.* at 1223, as well as under 18 U.S.C. § 659, *see United States v. Redd*, 438 F.2d 335, 336 (9th Cir.) (per curiam), *cert. denied*, 402 U.S. 977, 91 S.Ct. 1681, 29 L.Ed.2d 143 (1971).

■■■ When meeting with Thomas, Taylor displayed a copy of one of the bonds.

---

Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**3.** The concurring opinion here acknowledges that *United States v. Bell* is authority for determining value by the face value of the instrument, but believes that decision to be incorrect. We, of course, are bound by circuit precedent unless and until it is changed.

This copy lacked a serial number, the name of the registered holder, and a necessary signature. Taylor sought a buyer who would pay cash for $22–25 million of these bonds. During his negotiations with agent Baken, Pinto referred to the bonds as "hot." Pinto negotiated a low sales price of 11% of face value and carried out the sale in a hotel room with co-defendant Omega waiting close by in the hallway. Viewing the evidence in the light most favorable to the government, this evidence is sufficient to allow the jury to conclude that both appellants knew that the bonds were stolen.[4]

■ Appellants also argue that the government failed to show that the stolen bonds had been transported interstate. The government introduced evidence during trial that the bonds had originally been consigned for transport from New York to Baltimore and that Pinto had mentioned several times during his negotiations with agent Baken that the bonds were in New York. In addition, Pinto requested and was given $800 for his associate to fly to New York to bring back the bonds. When arrested, co-defendant Omega, who had left with Pinto after Pinto received the $800 cash, had on his person a scrap of paper listing flight times from Las Vegas to New York. Although Pinto testified at trial that he had falsely stated that the bonds were in New York and that he requested the $800 for gambling money, the jury evidently disbelieved Pinto's self-serving story. Viewing the evidence most favorably to the government, the jury could rationally infer that the stolen bonds were in fact transported from New York to Las Vegas.

Taylor further argues that the government presented insufficient evidence that he was part of the conspiracy. Taylor claims that the evidence showed that he believed he was arranging a legitimate sale for which he would receive a commission.

■ Once the government establishes that a conspiracy exists, evidence of only a slight connection to the conspiracy is necessary to convict a defendant of knowing participation in it. *United States v. Arbelaez*, 719 F.2d 1453, 1458 (9th Cir. 1983), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). As already stated, Taylor, displaying a facially incomplete bond to Thomas, asked if Thomas' connections could dispose of $22–25 million of these bonds. Taylor, aware that Baken had negotiated a cash sales price of only 11% of face value, later demanded his commission from Thomas. Such evidence sufficiently sustains the jury's conclusion that Taylor was a knowing participant in the conspiracy.

### 4. *Independent Evidence Corroborative of Pinto's Admissions*

Pinto claims that denial of his motion for judgment of acquittal was erroneous because the government failed to introduce sufficient corroborative evidence of the crimes independent of Pinto's admissions.

■ "It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." *Wong Sun v. United States*, 371 U.S. 471, 488–89, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963). We assume that Pinto's statements to undercover agent Baken and to cooperating citizen Thomas required corroboration, *but cf. Smith v. United States*, 348 U.S. 147, 155, 75 S.Ct. 194, 198, 99 L.Ed. 192 (1954) (admissions made in circumstances other than after the fact to an investigatory official may not have to be corroborated); *Ogden v. United States*, 303 F.2d 724, 742 (9th Cir.1962) (rule requiring independent corroboration of a defendant's admissions applies only to admis-

---

4. Taylor also argues that the government failed to show that the bonds had been stolen while they were traveling in interstate commerce. However, the government introduced bills of lading and other documents showing that the bonds were placed in a sealed container at Kennedy Airport for shipment to Baltimore. When the container arrived in Baltimore and was opened, the bonds were missing.

sions made after the commission of the offense), *cert. denied,* 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964), but we conclude that the government did introduce sufficient evidence corroborative of Pinto's admissions.

Pinto was arrested after displaying several of the A.C.F. Industries bonds. Moreover, he accepted $800 for his associate to fly to New York City to retrieve the bonds, and co-defendant Omega was arrested in possession of a scrap of paper with flight times between Las Vegas and New York. This independent evidence, while not overwhelming, sufficiently corroborates Pinto's admissions and thus helps establish their reliability. *See Smith,* 348 U.S. at 156, 75 S.Ct. at 199.

### 5. *Admission of Co-conspirators Statements*

Appellants argue that the district court should not have admitted audio-tape recordings under the co-conspirator exception to the hearsay rule. The recordings consisted of Pinto's conversations with undercover agent Baken wherein Pinto negotiated the sale of the bonds, as well as Taylor's conversation with cooperating citizen Thomas the day after Pinto's arrest. Appellants object to these conversations on the ground that the government failed to make the requisite foundational showing by independent evidence that a conspiracy existed among the defendants.

This argument is without merit. Each appellant's own actions independently established the existence of the conspiracy sufficiently to permit the introduction of the other appellant's taped statements.

■ Nevertheless, to admit statements by co-conspirators, there must be sufficient evidence to support an inference that the statements were made during the conspiracy and in furtherance of it. *United States v. Miller,* 771 F.2d 1219, 1233 (9th Cir.1985). The district court's decision on this issue will be disturbed only if the judge could not reasonably have come to that conclusion. *Id.* Moreover, we will defer to the district court's factual finding that a statement was made in furtherance of a conspiracy. *Id.*

■ The district court did not err in admitting the taped conversations. Pinto's conversations with Baken while negotiating the sale of the bonds were clearly admissible against him as admissions. *See Fed. R. Evid.* 801(d)(2)(A). Moreover, the statements were made in furtherance of the conspiracy since they consisted of Pinto's attempt to negotiate and carry out the sale of the bonds; thus they were admissible against Taylor as a co-conspirator under Fed.R.Evid. 801(d)(2)(E).

■ Although Taylor's phone conversation with Thomas occurred after Pinto and Omega had been arrested, it was nonetheless admissible against Taylor because the statements constitute admissions by him. *See* Fed.R.Evid. 801(d)(2)(A). The conversation also was admissible against Pinto as co-conspirator statements. Although statements made by a co-conspirator after his arrest cannot be used against fellow conspirators, *see United States v. Saavedra,* 684 F.2d 1293, 1298 (9th Cir. 1982), the converse is not true; statements made by an *unarrested* co-conspirator who is still operating in furtherance of the ongoing conspiracy may be introduced against the arrested conspirator. *Id.; United States v. Wentz,* 456 F.2d 634, 637 (9th Cir.1972). Taylor was unaware that the plan to sell the blank bonds had ended with the arrest of Pinto and Omega. Absent such knowledge, the conspiracy remained in operation as Taylor was seeking to carry out its next step—receipt of his commission for introducing the buyer and seller. Consequently, there was sufficient evidence to support the district court's conclusion that the statements by Taylor were made in furtherance of the conspiracy.

### 6. *FBI "Rough Notes"*

At the time of arraignment, the district court declared the case "open file." The court later ordered that the government preserve FBI "rough notes." "Rough notes" are the original notes taken by

agents during interviews with prospective witnesses. The FBI must preserve these notes in order to aid the trial court in determining what evidence must be produced at trial. *United States v. Harris*, 543 F.2d 1247, 1253 (9th Cir.1976). The magistrate ordered all Jencks Act and *Brady* statements produced ten days prior to trial. That order also required the government to produce all notes of statements made by the defendants pursuant to Fed.R.Crim.P. 16(a)(1)(A).

 Taylor argues that the government's failure to produce certain rough notes of the interrogation of the co-defendants until the day of trial constituted a violation of the Jencks Act, 18 U.S.C. § 3500. The Jencks Act, however, limits compulsory pretrial discovery of statements made by prospective government witnesses and makes them unavailable until such witnesses have testified at trial. *United States v. Griffin*, 659 F.2d 932, 936 (9th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2019, 72 L.Ed.2d 473 (1982). Thus, even assuming the rough notes contained "statements" within the meaning of the Act, 18 U.S.C. § 3500(e), and that the co-defendants were government witnesses, the Jencks Act provides that the government did not have to produce the notes prior to trial. Taylor admits that the government produced the notes on the day of trial. Accordingly, there was no violation of the Jencks Act.[5]

 While the government did not violate the Jencks Act, the district court concluded that the government's failure to produce the rough notes until the scheduled day of trial violated the magistrate's *discovery order*, and, with the government's acquiescence, the court ordered the notes produced. Where a party fails to comply with a valid discovery order, the court may grant a continuance, or prohibit the party from introducing evidence not disclosed. Here, the order was itself inconsistent with the express provision of the Jencks Act and therefore unenforceable. There was no bad faith by the government in failing to produce the notes earlier and the court, as it could, granted a two-day continuance to allow defense counsel time to review the notes and prepare for trial.

 Although appellants contend that a two-day continuance was insufficient time to review the "rough notes," they did not object to the length of the continuance nor did they move for further time. Appellants also do not show wherein the two-day continuance was inadequate. They therefore have not shown any abuse of discretion by the court in granting the two-day continuance.

### 7. Ineffective Assistance of Counsel

 Pinto contends that he was denied his Sixth Amendment right to effective assistance of counsel at trial. To establish such a claim, the defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

 Pinto points to a colloquy with the trial judge wherein he communicated his dissatisfaction with his attorney's performance and sought to represent himself. In this conversation, Pinto expressed his confusion about the legal principles of the case and admitted that he was not qualified to represent himself. The court determined that trial counsel should continue to repre-

---

5. Taylor also argues that the rough notes were discoverable prior to trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To establish a constitutional violation under *Brady*, the defendant must be able to raise a colorable claim that the rough notes contain evidence favorable to the defendant and material to his claim of innocence or to the applicable punishment, and that such exculpatory evidence had not been included in any for-mal interview report provided to the defendant. *United States v. Griffin*, 659 F.2d 932, 939 (9th Cir.1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2019, 72 L.Ed.2d 473 (1982). Taylor was provided with the FBI 302 reports of the interrogations of the co-defendants as well as of himself. Later, he was provided the rough notes. He has made no showing that the rough notes contained material not present in the 302 reports.

sent Pinto. This discussion does not demonstrate that trial counsel's performance was deficient, but only that Pinto was having trouble grasping the legal challenges being made by the various defense counsel.

 Pinto claims that careful scrutiny of the record would demonstrate that his trial counsel failed to expend the time and energy necessary to adequately prepare his defense. However, to satisfy his burden of demonstrating ineffective assistance of counsel, "[t]he defendant must point to errors or omissions in the record on appeal that establish that he did not receive adequate representation." *United States v. Rogers,* 769 F.2d 1418, 1424 (9th Cir.1985) (emphasis omitted). Because Pinto presents only vague and speculative assertions that his trial counsel lacked professional competence, he has failed to meet the burden set forth in *Strickland.*

AFFIRMED.

NOONAN, Circuit Judge, concurring:

The court uses two measures of value to uphold the convictions. It holds that each bond had "a printed face value of $50,000." But an incomplete instrument has no face value. The numbers on the incompleted form do not proclaim anything until the instrument is signed and appears to be in due form. On its face an incomplete instrument proclaims its lack of value.

One of the two approaches to value taken in *United States v. Bell,* 742 F.2d 509 (9th Cir.1984) is to the contrary. The part of that opinion finding face value in a blank money order is not in agreement with several other cases using only street value, that is the value established by a thieves' market, to determine the value of blank instruments. *United States v. Tyers,* 487 F.2d 828 (2d Cir.1973); *Churder v. United States,* 387 F.2d 825 (8th Cir.1968).

The latter decisions seem to me to be correct. The jury in the instant case was given no instructions as to how it should determine value other than a repetition of the words of the statute that value "means the face, par or market value, whichever is greatest" and an instruction on market value that "when a seller of securities willingly agrees to a sales price with a willing buyer the market value is thus set. This applies to either the legal or illegal market place." No objection was made by the defendants to this instruction. The problem that a market created by a government agent may be an artificial market was not brought to the trial court's attention. But it was not plain error to omit an instruction pointing to the government's part in creating the market. On the facts of this case, it was reasonable for the jury to conclude that the price of $110,000 agreed to by Pinto and Agent Burkes was the market value of the securities.