December 9, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1122

UNITED STATES OF AMERICA,

Appellee,

v.

STEPHEN C. JONES,

Defendant, Appellant.

ERRATA SHEET

Please make the following correction in the opinion in the above
case released on December 3, 1993:

Page, line 2: "entences" should be corrected to read
"sentences"

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1122

UNITED STATES OF AMERICA,

Appellee,

v.

STEPHEN C. JONES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Selya and Stahl, Circuit Judges,

and Fuste,* District Judge.

Morris M. Goldings with whom Richard S. Jacobs and Mahoney,

Hawkes & Goldings were on brief for appellant.

Margaret D. McGaughey, Assistant United States Attorney, with

whom Jay P. McCloskey, United States Attorney, and Raymond C. Hurley,

Assistant United States Attorney, were on brief for appellee.

December 3, 1993

*Of the District of Puerto Rico, sitting by designation.

FUSTE, District Judge. Defendant Stephen C. Jones
FUSTE, District Judge.

was convicted of conspiracy to defraud two federally insured

banks and to transport forged securities in interstate commerce

in violation of 18 U.S.C. 2314 (Count 1), bank fraud in

violation of 18 U.S.C. 1344 (Counts II and III), and the

interstate transportation of forged securities in contravention

of 18 U.S.C. 2314 (Counts IV and V). Jones argues on appeal

that (1) a UCC-3 release of collateral form is not a "security"

as defined by pertinent statute and his conviction on Counts IV

and V should, therefore, be reversed; (2) the judge incorrectly

gave a willful blindness instruction as to Jones' intent; (3)

there was insufficient evidence to support the verdicts; (4) the

court erroneously denied a motion to sever Jones' trial from that

of his codefendant, and (5) the sentence was overly severe and

was incorrectly based on Jones' occupation as an attorney.

We conclude that a UCC-3 release of collateral form is

not a security as provided for in the applicable statute, the

willful blindness instruction was correctly given, and the denial

of the motion for severance was not an error. We reverse the

conviction on Counts IV and V and the consecutive ten-year

sentence imposed for the transportation of forged securities. We

find that there was sufficient evidence to support Jones'

-2-
2

conviction on Counts I, II, and III and therefore the five-year

concurrent sentences imposed on those counts shall stand.

I.

Background

Viewing the evidence in the light most favorable to the

government, see United States v. Rivera-Santiago, 872 F.2d 1073,

1078-79 (1st Cir.), cert. denied, 492 U.S. 910 (1989), the

following facts were established at trial. During the early

1970s, defendant Stephen C. Jones, together with his father Allan

and Jones' codefendant, Robert Welch, formed a holding company

called Iyanough Management, which over the years acquired a

number of hotels, motels, and other property. In 1985, Iyanough

Management entered into a partnership known as Armory Hotel

Associates with a group of contractors and developers in Maine.

The purpose of the partnership was to convert an old armory

building in Portland, Maine, into the Portland Regency Inn. The

renovations were financed through a loan from Patriot Bank for

$8.2 million, which was secured by a mortgage of the building and

a security interest covering the furniture, fixtures, and

equipment of the hotel. A further cash infusion into the project

was obtained from the Berkshire Saving Bank in the form of a $2

million irrevocable line of credit, which was secured by a second

mortgage on the building and a second security interest in the

-3-
3

furniture, fixtures, and equipment of the hotel. As a part of

the original mortgage agreement with the two banks, Armory Hotel

Associates signed a UCC-1 form with each bank. This form is a

financing statement which certifies that a party holds a security

interest in particular property. The UCC-1 is filed with the

Secretary of State's office so that any later parties will be

aware that there is an encumbrance upon the property. Each of

the mortgage agreements with the banks provided that no

additional encumbrances upon the collateral could be incurred,

and in the event that any part of the security was sold or

transferred, the entire mortgage debt would be due and payable on

demand. As one of the partners in the Armory Hotel Associates,

Jones signed the notarized mortgage security agreements with both

banks.

Beginning in 1987, Iyanough Management began to

experience financial difficulties. As a measure to generate cash

flow, a sale and lease back of the furniture, fixtures, and

equipment of the Portland Regency Inn was negotiated through

broker David Mudie. Mudie was originally led to believe that

Iyanough Management owned the Portland Regency and its furniture,

fixtures and equipment. Through a search with the Secretary of

State's Office, Mudie found out that Armory Hotel Associates

actually owned the hotel and its contents, and discovered the

-4-
4

lien on the fixtures, furniture and equipment. As a result, in

order to complete the sale and lease back, Kansallis Finance

Ltd., the group financing the transaction, required that a

release of the security interests of Berkshire County Savings

Bank and Patriot Bank be perfected through the filing of UCC-3

forms. A UCC-3 is a document which can be used to release a

security interest in certain property which has been memorialized

in a UCC-1.1 Welch induced employees of Iyanough Management to

forge the signatures of the loan officers of the two banks on the

release forms. The two forged documents, purporting to release

the interest of the two banks, were filed with the Secretary of

State's office in Maine in August 1987. Welch also directed an

employee to forge the signature of one of the Maine partners of

the Armory Hotel Associates on various other forms required by

Kansallis.

One of Kansallis' prerequisites for the closing was an

opinion letter from counsel for Armory Hotel Associates opining

that Kansallis was receiving a first security interest in the

collateral consisting of the furniture, fixtures, and equipment.

Two drafts of the opinion letter were sent to Jones at his law

firm by the attorney for Kansallis. The final opinion letter was

1A UCC-3 can also be used to continue, assign or amend a
security interest. When we discuss the document in this case, we
are referring to its use as a release of a security interest.

-5-
5

returned to Kansallis' counsel on the letterhead of Jones' law

firm, and was signed by John Aufiero, counsel for Iyanough

Management. Aufiero testified at trial that he was given the

form by Jones to sign. David Mudie testified that he spoke with

Jones several times about the transaction and the documents

necessary to complete the arrangement. When the transaction was

completed, the sum of $1,288,533 was wired to Iyanough

Management's account. Approximately $290,000 of the proceeds of

the loan were eventually transferred into an account in Jones'

name.

FBI Agent James Osterrieder interviewed Jones as part

of his investigation of the forged documents. During the

interview, Jones stated that initially it was his idea to carry

out the sale and lease back of the furniture, fixtures, and

equipment, in order to generate cash. Jones stated that he knew

that the banks had a lien on the equipment, but thought that

there was a clause in the closing document which would allow for

the sale and lease back. Jones also told the agent that he and

Welch had discussed the need for a UCC-3 release of interest

before the sale and lease back could proceed, but that Welch said

that he would take care of the problem. Jones admitted that he

had seen a draft of the opinion letter which was required by

Kansallis to consummate the sale and lease back deal, and that he

-6-
6

arranged to have Aufiero sign the letter because Jones was out of

town at the time.

Robert Welch pled guilty to bank fraud and interstate

transportation of forged securities, and proceeded to trial on

the conspiracy charge. At trial, Welch testified that he

completed the arrangement for the sale and lease back without

telling Jones the details of the transaction, and that Jones

never questioned Welch about the deal. Both defendants argued

that Welch, working alone, caused the UCC-3 documents to be

forged by Iyanough Management employees and filed with the

Secretary of State. Welch was found guilty of conspiracy and

Jones was found guilty on all counts.

II.

Discussion

A. Release of Collateral as a Security Interest

Jones first argues that a UCC-3 is not a "security" for

the purposes of 18 U.S.C. 2314. 18 U.S.C. 2311 defines the

term "security" as used in 2314.2 The district court found,

2Section 2311 provides:

"[S]ecurities" includes any note, stock
certificate, bond, debenture, check, draft,
warrant, traveler's check, letter of credit,
warehouse receipt, negotiable bill of lading,
evidence of indebtedness, certificate of
interest or participation in any profit-
sharing agreement, collateral-trust

-7-
7

and the government argues, that a UCC-3 is analogous to an

"instrument or document or writing . . . transferring or

assigning any right, title or interest in or to goods, wares and

merchandise." We disagree and hold that a UCC-3 release of

collateral is not a "security" for the purpose of 18 U.S.C.

2314.

Statutory interpretation is a question of law and,

therefore, is subject to de novo review. United States v.

Taylor, 802 F.2d 1108, 1112 (9th Cir. 1986), cert. denied, 479

U.S. 1094 (1987). It has been found that Congress intended a

broad definition of securities in the context of outlawing the

transportation of falsely made or forged securities in interstate

commerce. United States v. Speidel, 562 F.2d 1129, 1131 (8th

Cir. 1977), cert. denied, 435 U.S. 915 (1978). An analysis of

certificate, preorganization certificate or
subscription, transferable share, investment
contract, voting-trust certificate; valid or
blank motor vehicle title; certificate of
interest in property, tangible or intangible;
instrument or document or writing evidencing
ownership of goods, wares, and merchandise,
or transferring or assigning any right,
title, or interest in or to goods, wares, and
merchandise; or in general, any instrument
commonly known as a "security", or any
certificate of interest or participation in,
temporary or interim certificate for, receipt
for, warrant, or right to subscribe to or
purchase any of the foregoing or any forged,
counterfeited, or spurious representation of
any of the foregoing.

-8-
8

the cases applying the definition of "security" under

section 2314, however, does not result in a clear picture of

exactly what is encompassed in this broad definition, or how to

proceed in determining whether novel instruments should also be

included.

The district court relied upon Speidel, supra, in

support of its finding that a UCC-3 is a security. In Speidel,

the Eighth Circuit held that a quitclaim deed is a security. The

court found that although a quitclaim deed is not the type of

item normally considered as a security by the commercial and

financial community, such an instrument is an express conveyance

of whatever interest and title the grantor has in a piece of

property. Although it warrants no specific interest in property,

it does transfer some interest in property. Such a deed may be

used to convey interests in land, to clear title to land

encumbered by liens or to transmit full title to land by

conveying the grantor's entire interest to any grantee. After a

quitclaim deed is conveyed, the grantee holds the entire interest

which the grantor had owned.

We are unable to agree with the district court that a

UCC-3 is analogous to a quitclaim deed. Unlike a quitclaim deed,

the UCC-3 at issue in this case is not effective by itself to

transfer or assign a title, right or interest in or to property.

-9-
9

At most, one could argue that the UCC-3 transfers an interest

from the secured party back to the owner of the property. This

is a much more constrained purpose than the potential uses of a

quitclaim deed, and only permits a transfer of a limited interest

to one particular party, the original owner. The sole result of

the filing of a UCC-3 is that the owner of the property has a

title free of encumbrances and can proceed to transfer the lien

free property to another party. In this case, the UCC-3 was

merely one step in the process of transferring an interest in the

fixtures, furniture, and equipment to a third party, and was

insufficient on its own to convey title to the items listed.

Furthermore, a UCC-3 does not contain the same

qualities as other documents which have been deemed securities.

In determining whether an instrument is a security, other courts

have examined factors such as whether the document evidences an

obligation for the payment of money or represents a particular

interest in goods or property and has inherent value, United

States v. Canton, 470 F.2d 861, 863 (2d Cir. 1972); whether the

instrument has intrinsic value and is recognized and treated as

having intrinsic value in the regular channels of commerce, and

whether the document could be sold, United States v. Wexler, 621

F.2d 1218, 1224 (2d Cir.), cert. denied, 449 U.S. 841 (1980);

whether the item could be used as collateral and represents an

-10-
10

acknowledgment of a debt owed or a contractual obligation to pay

in the future, United States v. Austin, 462 F.2d 724, 736 (10th

Cir.), cert. denied, 409 U.S. 1048 (1972); and whether the

document purports to be valuable and is sufficient to establish a

given right, relationship or property interest. United States v.

Johnson, 700 F.2d 163, 175 (5th Cir. 1983).

The effect of the forged UCC-3 release here was only to

terminate the security interest which the two banks held in the

fixtures, furniture, and equipment of the Portland Regency Inn.

By itself, a document of release has no value, and does not

represent a tangible or intangible valuable property right. Such

a form could not be sold or used as collateral. It does not

represent an acknowledgment of a debt owed or a contractual

obligation to pay in the future. The form was valuable only to

the Armory Hotel Associates and not to any third party. A UCC-3

serves merely to terminate and not to transfer or assign any

property interest.

In addition, we recognize that when, as in this case,

there is ambiguity in a criminal statute, such ambiguity should

be construed in favor of the defendant. United States v.

Borowski, 977 F.2d 27 (1st Cir. 1992). Because we hold that a

UCC-3 is not a security as defined for the purposes of 18 U.S.C.

2314, Jones' conviction on two counts of interstate

-11-
11

transportation of forged securities pursuant to this section must

be reversed.

B. Willful Blindness Instruction

Next, Jones objects to the "willful blindness"

instruction given to the jury, arguing that there was no evidence

that he was aware that a crime was likely in progress and no

evidence that he facilitated it. A willful blindness instruction

is appropriate when (1) defendant claims a lack of knowledge;

(2) the facts suggest a conscious course of deliberate ignorance,

and (3) the instructions, taken as a whole, cannot be

misunderstood by a juror as mandating an inference of knowledge.

United States v. St. Michael's Credit Union, 880 F.2d 579, 584

(1st Cir. 1989). Here, the first element is obviously present

since Jones claims that he was ignorant of any wrongdoing. The

second requirement may be established from the evidence adduced

at trial. Jones, as one of the partners, signed the original

mortgage agreements with Patriot Bank and Berkshire County

Savings Bank. By signing these agreements, he displayed

knowledge of the encumbrances placed on the fixtures, furniture,

and equipment of the Portland Regency Inn. He also would have

known that the agreements provided that Armory Hotel Associates

could not incur any additional encumbrances on the collateral,

and that the mortgage would become due and payable if any of the

-12-
12

collateral was sold or transferred. There was evidence produced

at trial that Jones and Welch discussed the need to obtain cash

for Iyanough Management, and the possibility of obtaining such

cash through a deal with Mudie involving a sale of the furniture,

fixtures, and equipment of the Portland Regency Inn. There was

evidence that Mudie discussed the deal with Jones and that

Rodr guez, the lawyer for Kansallis, sent documents to Jones

regarding the deal, including drafts of the opinion letter. In

its final form, this opinion letter represented, among other

things, that the firm was acting as counsel for Armory Hotel

Associates and that there were no other encumbrances on the

furniture, fixtures, and equipment so that Kansallis' security

interest was perfected. Furthermore, John Aufiero testified that

Jones brought him the opinion letter on the letterhead of Jones'

law firm, and requested that Aufiero sign the document.

Testimony by the FBI agent established that initially

it was Jones' idea to arrange the sale and lease back of the

furniture, fixtures, and equipment. Jones told the agent that he

was aware of the banks' liens on the equipment but felt that

there was some way out of them. According to Jones, Welch later

told Jones that Welch did not think that the bank would release

the collateral, but that Welch would take care of it. The day

after the money came through from Mudie and Kansallis, there was

-13-
13

evidence that Jones personally received checks totalling

approximately $290,000.

This evidence, taken in the light most favorable to the

government, is sufficient for a jury to conclude that Jones knew

about the deal with Kansallis and Mudie, and knew that such a

deal would not be able to go forward without a release of the

prior security interests held by the two banks in the furniture,

fixtures, and equipment of the Portland Regency Inn. Moreover,

there is sufficient evidence from which a jury could conclude,

that Jones knew both (1) that the banks would not release their

interests unless their mortgages were paid in full, and (2) that

the opinion letter was an alternative means of representing to

Kansallis that the property was no longer encumbered by any prior

liens. Even if, as Welch testified, Jones was unaware of the

actual steps taken by Welch to release the security interest, we

find that the facts established at trial suggest that this lack

of knowledge could have been due to a conscious course of

deliberate ignorance on the part of Jones.

The jury instruction given was not likely to give

jurors the impression that they were compelled to make an

inference of knowledge on the part of Jones. The judge

instructed the jury

[t]hat in considering whether defendant
Stephen Jones knowingly committed any

-14-
14

offense, you may infer but are not required
to infer, knowledge on his part from a
combination of suspicion and indifference to
the truth if you find beyond a reasonable
doubt that to have existed on his part. [sic]
If you find that he had a strong suspicious
[sic] that things were not what they seemed,
or that someone had withheld some important
facts, yet that he shut his eyes for fear of
what he would learn, you may conclude that he
acted knowingly . . . . With regard to any
such inference you must reason with care.
You may not draw this inference or knowledge
from negligence or mistake. I instruct you
that negligence, even gross negligence, is
not a proper basis to support a finding of
wilfulness, or to support a finding of
knowledge, nor is error or mistake . . . I'm
not suggesting one way or the other how you
should find with respect to this matter. I
am not suggesting that you make any such
finding, or that if you do, what the finding
should be. I'm simply telling you . . . that
you may infer knowledge if you find willful
blindness to a fact to have occurred.

This instruction clearly did not mandate a finding of knowledge

on the part of the jury.

Jones objects that the court failed to utilize the

instructions on willful blindness which the defendant offered,

arguing that his wording "more properly put such instruction in

the proper context for the jury." The failure to give a

requested jury instruction is reversible error only if "the

requested instruction is substantially correct, was not

substantially covered in the charge actually given, and covers an

important point in the trial so that the failure to give it

-15-
15

seriously impaired the defendant's ability to present a given

defense." United States v. Nason, No. 92-2303, slip op. at 11

(1st Cir. July 9, 1993) (citing United States v. Newton, 891 F.2d

944, 949 (1st Cir. 1989)). Jones' argument fails under this

test. Although his requested instruction is substantially

correct, Jones fails to point out in what manner his instructions

were superior to those given, and a comparison of the two sets of

instructions shows no material difference in what was conveyed to

the jury. There is no suggestion that an important point was not

conveyed by the given instructions. We find no error in the

judge's declining to adopt Jones' suggested instructions.

C. Sufficiency of the Evidence

Jones argues that there was insufficient evidence to

sustain his conviction. In order to successfully challenge the

sufficiency of the evidence on appeal, a defendant must show that

no reasonable jury could have found him guilty beyond a

reasonable doubt. United States v. Innamorati, 996 F.2d 456, 469

(1st Cir. 1993). On appeal, we must view the evidence in the

light most favorable to the government, "drawing all plausible

inferences in its favor and resolving all credibility

determinations in line with the jury's verdict." United States

v. David, 940 F.2d 722, 730 (1st Cir.), cert. denied, U.S.

-16-
16

(1991). We will examine the conspiracy and bank fraud charges in

turn.

1. Conspiracy Charge

Conviction of conspiracy requires proof that the

defendant entered into an agreement with another to commit a

crime; the agreement need not be express but may be implicit in a

working relationship. Innamorati, 996 F.2d at 470. The

government must prove two kinds of intent: intent to agree and

intent to commit the crime. However, "[t]he government need not

prove that a co-conspirator knew all of the details or

participated in all of the objectives of the plan." United

States v. G mez-Pab n, 911 F.2d 847, 853 (1st Cir. 1990), cert.

denied, 498 U.S. 1074 (1991) (citations omitted).

In order to convict Jones of conspiracy to commit bank

fraud,3 the prosecution must show that Jones and Welch agreed to

defraud Patriot Bank and Berkshire County Savings Bank. Jones

argues that the fraud perpetrated upon the banks was completed on

July 23, 1987, when the forged UCC-3 forms were filed with the

Maine Secretary of State, and that the only direct evidence

connecting Jones to any fraudulent activity was the opinion

3Our disposition of this appeal renders moot any discussion
of the part of the charge for conspiracy to transport forged
securities in interstate commerce. For that reason, we limit the
analysis to the sufficiency of the charge for conspiracy to
commit bank fraud.

-17-
17

letter dated August 10, 1987. This claim, however, ignores the

evidence that Jones knew about the possibility of the sale and

lease back arrangement, and discussed with Welch the need to

obtain releases from the two banks. From this, the jury could

have inferred that even if Jones did not have actual knowledge

that Welch was forging the UCC-3 forms, he knew that there was a

need to obtain a release from the banks, he was aware that the

bank would not allow such a release unless the mortgage was paid

in full, and he knew that somehow Welch was going to "take care

of it." Based on this evidence, a reasonable jury could conclude

that even if there was no express agreement, Jones sat passively

by and let his partner proceed with the sale and lease back,

knowing that the transaction could not be completed legally and

would effect a fraud on the new lender.

2. Bank Fraud Charges

In order to convict Jones of bank fraud under 18 U.S.C.

1344(1), the jury had to find beyond a reasonable doubt that

Jones "engaged in or attempted to engage in a pattern or course

of conduct designed to deceive a federally chartered or insured

financial institution into releasing property, with the intent to

victimize the institution by exposing it to actual or potential

loss." United States v. Ragosta, 970 F.2d 1085, 1089 (2d Cir.),

cert. denied, U.S. (1992) (quoting United States v.

-18-
18

Stavroulakis, 952 F.2d 686, 694 (2d Cir. 1992)). The element of

intent can be established through circumstantial evidence and

inferences drawn from evidence presented at trial. Id. at 1090.

The same evidence which serves to sustain a conviction

for conspiracy to commit bank fraud will suffice to affirm Jones'

conviction for bank fraud under a willful blindness theory.

Jones knew that a sale and lease back of the furniture, fixtures,

and equipment was being planned. He knew that Kansallis required

a release of the banks' interest and that such a release would

not be granted unless the mortgage was paid off. Even if, as

Welch testified, Jones never found out about the forgery and just

trusted Welch to work out a deal which would provide the

desperately needed cash, a rational jury could have concluded

that Jones deliberately shut his eyes to what was occurring.

"The purpose of the willful blindness theory is to impose

criminal liability on people who, recognizing the likelihood of

wrongdoing, nonetheless consciously refuse to take basic

investigatory steps." United States v. Rothrock, 806 F.2d 318,

323 (1st Cir. 1986). The evidence presented at trial was

sufficient for a conviction on the counts of bank fraud.

D. Motion to Sever

-19-
19

Jones moved for severance of his trial from that of

codefendant Welch under Fed. R. Crim. P. 14.4 The court denied

his motion, holding that Jones failed to persuasively demonstrate

that he would incur prejudice at trial as a result of the

joinder. Jones appeals the denial, arguing that he was a victim

of the prejudicial spillover of evidence against his codefendant,

who had already pled guilty to the substantive counts charged.

In addition, Jones suggests that the jury may have held him to a

higher standard than Welch since Jones was an attorney. Finally,

Jones argues that the joinder improperly placed him in a position

where, in order to exercise his Fifth Amendment privilege against

self-incrimination, he was forced to accept an adverse jury

inference.

The grant or denial of a motion for severance is left

to the discretion of the trial court and will only be disturbed

for an abuse of that discretion. United States v. Porter, 764

F.2d 1, 12 (1st Cir. 1985). For reasons of judicial economy, co-

4Fed. R. Crim. P. 14 provides in part:

If it appears that a defendant or the
government is prejudiced by a joinder of
offenses or of defendants in an indictment or
information or by such joinder for trial
together, the court may order an election or
separate trials of counts, grant a severance
of defendants or provide whatever other
relief justice requires.

-20-
20

conspirators are generally tried together absent a strong showing

of prejudice. United States v. Perkins, 926 F.2d 1271, 1280 (1st

Cir. 1991). In order to obtain a severance, a defendant must

show that substantial prejudice, amounting to a miscarriage of

justice, would result from a joint trial. United States v.

Sabatino, 943 F.2d 94, 96 (1st Cir. 1991). Mere speculative

allegations as to possible prejudice from joinder do not sustain

the burden of showing an abuse of discretion in denying a motion

for severance.

Jones failed to show that the presence of Welch at

trial was so prejudicial as to warrant severance. Welch argued

at trial that there was no conspiracy between Jones and him

because Welch operated on his own to perpetrate the fraud upon

the banks and the transportation of the forged documents.

Several times on the stand Welch emphasized that he was the only

one responsible for the criminal acts. Such evidence could only

be helpful to Jones' claim that he had no knowledge of Welch's

activity.

Jones' claim of a spillover effect is also unavailing.

The danger which is to be prevented is that the jury will be

unable to separate the evidence against different defendants or

that evidence which is admissible against only one defendant will

be used by the jury against a co-conspirator. See Perkins, 926

-21-
21

F.2d at 1281. Usually, however, any prejudice caused by joinder

is best dealt with through instructing the jury to give

individual consideration to each defendant. United States v.

Bruner, 657 F.2d 1278 (D.C. Cir. 1981). Here, there is no

evidence, and Jones has not identified any, that the jury was

unable to evaluate separately and fairly the guilt or innocence

of each defendant. The judge instructed the jury that a guilty

plea by Welch could not be considered as evidence against Jones,

and also noted that each defendant should be given separate

consideration. He informed the jury that any evidence which was

admitted solely against one defendant could not be considered

against the other defendant.

Jones argues that the jury may have held him to a

higher standard of conduct than Welch because he is an attorney.

However, Jones presents no evidence that his occupation caused

the jury to view him more harshly. In any event, Jones could

have requested a special jury instruction that attorneys are held

to the same standard of conduct as others, and failed to do so.

See United States v. Picciandra, 788 F.2d 39, 46 (1st Cir.),

cert. denied, 479 U.S. 847 (1986).

Finally, Jones claims that the joinder, combined with

the willful blindness instruction, forced him to risk an adverse

inference on the part of the jury by exercising his Fifth

-22-
22

Amendment privilege not to testify. In Porter, we rejected the

argument that the antagonistic defense of a codefendant was

grounds for severance of trial because it would force the

defendant to testify in violation of the Fifth Amendment. 764

F.2d at 14. The need for severance to protect Jones' Fifth

Amendment rights was even more minimal, since Welch's defense was

completely in line with Jones' claim of innocence. The joinder

had no impact on Jones' Fifth Amendment rights and there was no

abuse of discretion in the trial court's refusal of the motion to

sever.

E. Severity of Sentence

Jones objects to the length of the fifteen-year

sentence by the trial court. He argues that a five-year sentence

would be appropriate for a first time offender such as himself.

Because we reverse Jones' conviction for the interstate

transportation of forged securities, his sentence is reduced to

five years for conspiracy to commit bank fraud and five years

each for two counts of bank fraud, to be served concurrently. We

see no reason to alter Judge Carter's assessment and pre-

guideline sentencing on Counts I, II, and III. Therefore, the

sentence on the remaining counts will stand as crafted by the

trial judge. See United States v. Jim nez-Rivera, 842 F.2d 545,

548 (1st Cir.), cert. denied., 487 U.S. 1223 (1988).

-23-
23

III.

Conclusion

Because we hold that a UCC-3 is not a "security" for

the purpose of 18 U.S.C. 2314, Jones' conviction on Counts IV

and V for the interstate transportation of forged securities is

reversed. Sufficient evidence was adduced at trial to convict
reversed

Jones of conspiracy and bank fraud on Counts I, II, and III, and

the trial court did not abuse its discretion by denying the

motion to sever Jones' trial from that of his codefendant. For

these reasons, Jones' convictions for conspiracy and bank fraud

are affirmed.
affirmed

-24-
24