GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff

v.

KEITH BENJAMIN, et al., Defendants

Civil Action No. 81/79

District Court of the Virgin Islands

Div. of St. Croix

May 14, 1990

KEITH BENJAMIN, Lompoc, CA, *petitioner pro se*

MICHAEL JOSEPH, ESQ., St. Croix, V.I., *for petitioner Benjamin*

JAMES S. CARROLL III, Assistant U.S. Attorney (Office of the U.S. Attorney), St. Thomas, V.I., *for Government*

BROTMAN, *Acting Chief Judge*

Presently before the court is Keith Benjamin's application pursuant to 28 U.S.C. § 2255 to vacate or set aside his sentence. Benjamin initially raised 18 separate grounds for relief through counsel

and pro se. After an evidentiary hearing, this court found the vast majority of Benjamin's assertions of constitutional violations to be without merit. With respect to the claim that newly discovered evidence required a new trial, the court rejected Benjamin's application after holding an evidentiary hearing. On appeal, the Third Circuit affirmed as to the refusal to grant a new trial on the basis of the newly discovered evidence. The Third Circuit remanded for "appropriate findings of fact and conclusions of law with respect to the grounds of relief numbered as 2 through 10." Government of the Virgin Islands v. Blyden, Civ. Nos. 86-3346, 86-3372, 86-3409 slip op. at 15 (3d Cir. Jan. 5, 1988).

Grounds 2 through 10 are as follows:

2. Ineffective assistance of trial counsel evidenced by the facts that (a) counsel was new in Islands and could not understand over 30 [percent] of testimony of government witnesses, (b) there was failure to object to empanelling of jury, which precluded appellate review, and (c) failure to follow rules in seeking a continuance so counsel could prepare for trial.

3. Exclusion of defense counsel from (or perhaps counsel's failure to attend) the pretrial lineup.

4. Failure of the government to provide Jencks Act statements until the morning of trial.

5. Denial of continuance to permit adequate preparation by counsel constituted a denial of due process.

6. Prejudicial closing remarks by the prosecutor.

7. Government concealed whereabouts of witnesses in violation of the Brady doctrine.

8. Admission of hearsay during testimony of Deon Williams violated the confrontation clause.

9. Government failed to obey court order regarding Benjamin's picture in violation of due process.

10. Two government witnesses misidentified Benjamin at trial in violation of due process.

Id. slip op. at 13. The parties briefed these issues in the Spring of 1988. For reasons not apparent from the record, the matter was not addressed by the district court, and in February, 1990, Benjamin filed a pro se petition for a writ of mandamus.[1] On March 27, 1990,

---

[1] It is unclear why the motion was not addressed from the Spring of 1988 through

the Third Circuit ordered that the nominal respondent, myself, "file a response to the petition within 60 days of the date of this order." Government of the Virgin Islands, C.A. No. 90-8026 (3d Cir. March 27, 1990).

The court now considers these issues.

## I. FACTS AND PROCEDURE

On direct appeal, the Third Circuit aptly summarized the facts that gave rise to the convictions as follows:

> Antonio "Tampo" Malone was shot to death at approximately 7:00 a.m. on June 4, 1981 as he repaired a tire on his automobile parked near his apartment in the Tutu Highrise Apartment Project in St. Thomas, Virgin Islands. A witness testified that shortly before the shooting, she heard someone say to Malone, "I came to kill you because you are a rat." She looked out of her apartment and saw a masked man outside a beige car parked nearby.
>
> After emptying his weapon at Malone, the gunman went to the beige car, got a second gun from one of the occupants, and returned to fire several more shots into the victim. The gunman then ran back to the car which sped away.
>
> A number of persons supplied details of the crime. The prosecution's principal witness was Miguel Delamos. He testified that on the evening before the shooting, he had seen defendants Antonio Rosado and Keith Benjamin in a beige car parked near Malone's apartment building. The witness had known both defendants for a number of years.

---

the Fall of 1989. The events from September of 1989, however, could explain, in part, the delay. After Hurricane Hugo, Chief Judge O'Brien's health precipitously declined, and on December 22, 1989, he passed away. I was designated the Acting Chief Judge on that day. See Moorhead v. Farrelly, 727 F. Supp. 193, 196 (D.V.I. App. Div. 1989) (Brotman, C.J.). The clerk of the district court of the Virgin Islands notified me of the status of this case in early March, 1990. This was the first time it was brought to my attention.

The backlog of cases in the Virgin Islands is well known. In an effort to insure that no cases go overlooked, I have directed that an inventory of all cases be performed, by computer and by hand. The computer inventory has disclosed that, as of March 31, 1990, there were 1,436 civil cases pending in the Division of St. Thomas and St. John, and 540 civil cases pending in the Division of St. Croix. As of the date of this opinion, there are no resident judges sitting in the District Court of the Virgin Islands.

The next day, about a half-hour before the murder, Delamos was walking near Malone's apartment building and saw the same beige car parked nearby. Rosado was in the driver's seat, Benjamin was next to him in the front, and defendant Dennis Blyden was in the back seat. The witness also observed defendant Samuel George seated on the ground not far away.

Delamos went to his apartment but upon hearing shots several minutes later, ran outside and up the street. He saw Blyden and Benjamin, both masked, get back into the beige car already occupied by Rosado. The car then drove away. Delamos also saw defendant George run up the street to his own Kharman Ghia and drive into the same direction as the beige car.

Other witnesses testified to hearing gun-shots and then seeing one or two individuals get into a beige car that drove away. Two other witnesses testified that sometime after 6 a.m. on the morning of the shooting they saw three individuals in a beige car parked near Malone's apartment building.

One of these witnesses, Dion Williams, recognized two of the occupants as George and Benjamin. Williams, however, could only identify George at trial and that was when he was recalled to the stand.

Government of the Virgin Islands v. Rosado, 699 F.2d 121, 123 (3d Cir.), cert. denied, 464 U.S. 832 (1983). On the day of the shooting, a police officer obtained a swab sample for a neutron activation test from Benjamin's hands. At trial, an expert testified that the test indicated that Benjamin had either fired a gun or had been very close to a gun that had been discharged. Id. at 123, cert. denied, 464 U.S. 832 (1983). Benjamin presented an alibi defense.

A jury convicted Benjamin of first degree murder, V.I. Code Ann. tit. 14, § 922(a)(1) (1964), and possession of a firearm during the commission of a crime of violence. V.I. Code Ann. tit. 14, § 2253 (Supp. 1981). The defendants, including Benjamin, raised several issues on direct appeal through counsel and pro sese. The Third Circuit declined to address Benjamin's contentions that his trial counsel was ineffective and noted that such claims must be resolved in a collateral proceeding under 28 U.S.C. § 2255 (1988). Rosado, 699 F.2d at 123 n.1, cert. denied, 464 U.S. 832 (1983).

The Third Circuit further rejected defendants' challenge to the jury selection procedure. Anticipating difficulties from the highly publicized nature of the case, the trial judge had ordered that an

unusually large venire panel be summoned. Despite this foresight, a petit jury panel had not been selected after three days of voir dire, and the venire, which had included in excess of one hundred and ninety persons, had been exhausted. In an unusual procedure, the district judge had directed the marshal to summon additional talesmen from the street. On direct appeal, the Third Circuit noted that none of the defendants had objected to this practice as required by the Jury Selection and Service Act, 28 U.S.C. § 1867(a), and therefore dismissed this aspect of the appeal. Rosado, 699 F.2d at 124–25, cert. denied, 464 U.S. 832 (1983).

The Third Circuit addressed other issues, including the sufficiency of the evidence, and affirmed the judgment entered by the district court. The court of appeals also found numerous other contentions raised by defendants to be without merit. Id at 122 ("After considering numerous other allegations of error, we conclude that they also have no merit."), cert. denied, 464 U.S. 832 (1983); id. at 123 n.1 (noting that defendants had raised arguments not considered in body of opinion, and stating that they were without merit although the court of appeals had followed usual practice in not considering claims of ineffective assistance of counsel), cert. denied, 464 U.S. 832 (1983); id. at 127–128 (appendix listing contentions raised by Benjamin through counsel and pro se), cert. denied, 464 U.S. 832 (1983).

Benjamin thereafter filed an application pro se to vacate or set aside his sentence pursuant to 28 U.S.C. § 2255 (1988). Chief Judge Christian denied the application in part, Government of the Virgin Islands v. Blyden, Crim. No. 81-79 (D.V.I. April 3, 1985), and held an evidentiary hearing concerning new evidence, the recantation by Delamos. Chief Judge Christian, who was the trial judge, then found that the remaining grounds raised did not warrant relief. Government of the Virgin Islands v. Blyden, Crim. No. 81-79 (D.V.I. May 7, 1986). The Third Circuit affirmed as to the denial of a new trial because of newly discovered evidence. The Third Circuit found, however, that the district court had not adequately explained its reasons for denying relief on the other grounds asserted, and therefore remanded to the district court to make appropriate findings of fact and conclusions of law. When the district court failed to act on the remand, a writ of mandamus was issued.

The court now proceeds to reconsider these issues.

## II. DISCUSSION

Defendant's claims can be categorized as ineffectiveness of counsel claims, assertions of due process violations, and miscellaneous other claims. These allegations of error will be considered seriatim.

### 1. Ineffectiveness Claims:

■ The Sixth Amendment right to counsel is the right to effective assistance of counsel. A conviction must be overturned if counsel's conduct "so undermined the proper functioning of the adversarial system that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1983). The defendant must show that counsel's performance fell below an objective standard of reasonableness. Id. at 688. There is a strong presumption that counsel's conduct was reasonable. Id. at 689. The reasonableness of counsel's conduct is judged on the facts of the particular case as of the time of counsel's conduct. Id. at 690.

■■ The defendant must also prove prejudice, that is, a reasonable probability that "but for counsel's unprofessional errors, the result would have been different." Id. at 694. See Dooley v. Petsock, 816 F.2d 885, 889 (3d Cir.), cert. denied, 484 U.S. 863 (1987). "A reasonable probability is a probability sufficient to undermine confidence in the trial's outcome." Strickland, 466 U.S. at 694. In resolving ineffectiveness claims, courts should "resolve cases wherever possible on grounds of prejudice, so that ineffective assistance claims do not become unduly burdensome to defense counsel." McNeil v. Cuyler, 782 F.2d 443, 449 (3d Cir. 1986) (citing Strickland, 466 U.S. at 2069–70), cert. denied, 479 U.S. 1010 (1986).

### A. Counsel's Asserted Inability to Understand Witnesses:

Benjamin argues that his trial lawyer, Attorney R. Thomas Day, was ineffective because he was able to understand only 30 percent of the testimony of government witnesses. The basis for this claim is that during a recess in examining the prosecution's principal witness, Miguel Delamos, Attorney Day stated that he "understood about 30 [percent] of what [he] was getting." Transcript (September 24, 1981) at 163.

When considered in the context of a lawyer engaged in advocacy, it becomes clear that this statement was an exaggeration. Counsel's cross-examination of Delamos shows that he did in fact understand him. Counsel attacked Delamos' credibility on several grounds. At-

torney Day asked a line of questions indicating that Delamos had received $100 from a police officer before coming forward with his testimony. Transcript (September 24, 1981) at 142. He also elicited testimony that Delamos did not come forward right away to identify any of the defendants even though the victim of the murder was supposedly a good friend of his and Delamos had claimed that he was unable to sleep because of the killing. Transcript (September 24, 1981) at 142. Attorney Day also sought to highlight some apparent inconsistencies in Delamos' testimony. Although there was some difficulty in the communication between Delamos and Attorney Day, the court finds as a fact that Attorney Day understood the vast majority of Delamos' testimony. The difficulty Attorney Day experienced was caused by his difficulty in understanding the substance of Delamos' testimony. In other words, any confusion was caused by Attorney Day's expectation that the testimony would be different than it was, and not by his inability to understand Delamos' accent. E.g., Transcript (September 24, 1981) at 116–17 (Delamos insulted by police officer, meaning that police told people to scatter), 145 (confusion as to whether dinner is evening meal), 146 (meaning of voluntarily not likely to be clear to witness), 163 (when witness says answer that question, he means repeat the question).

■ Although Delamos was an important government witness, the record reflects that Attorney Day did understand him, and that his cross-examination was not deficient. Cf. United States v. Petersen, 777 F.2d 482, 484 (9th Cir. 1985) (no ineffectiveness unless defendant could show counsel had fallen asleep for substantial part of trial), cert. denied, 479 U.S. 843 (1986). The trial judge summarized Attorney Day's performance as follows:

> Counsel zealously represented defendant Benjamin prior to and during trial. He sought and obtained relevant discovery, vigorously tested the credibility of prosecution witnesses, competently presented defendant's alibi defense, and generally put the government to its proof.

> While it is true that counsel did not immediately comprehend each and every response he elicited upon cross-examination of prosecution witness Miguel Delemos, he took pains to clarify those answers he did not immediately grasp, and performed a reasonably thorough cross examination of said witness.

Government of the Virgin Islands v. Blyden, Crim. No. 81-79 (D.V.I. April 3, 1985) slip op. at 10–11. There is nothing in the record that suggests the trial judge was mistaken in this evaluation.

B. *Failure to Object to Empanelling of Jury:*

Benjamin claims that trial counsel was ineffective in failing to object to the unusual, although "historically approved," Rosado, 699 F.2d at 124, cert. denied, 464 U.S. 832 (1983), method employed to produce the venire jury panel. The failure to object precluded review on direct appeal. Id. at 124–25, cert. denied, 464 U.S. 832 (1983). It appears that Benjamin claims that this resulted in the jury panel being unduly comprised of persons from the town. He also seems to claim that the jury was not impartial because each juror was threatened with the possibility of imprisonment if he or she elected not to serve on the jury. Benjamin's claim fails, however, for he has not shown that trial counsel's omission to object to the method employed for empanelling the jury was either unprofessional or prejudicial. Benjamin also fails to present any evidence to substantiate his claims that the jury was not a cross section of the community or that the jurors were partial.

Some background to the procedure employed by the trial judge to complete the petit jury is helpful to an understanding why the trial court acted in this manner. It may also explain in part why trial counsel did not object. Prior to 1968, federal law provided that "[w]henever sufficient petit jurors are not available, the court may order a special jury to be drawn or may require the United States marshal to summon a sufficient number of talesmen from the bystanders." Act of June 25, 1948, 62 Stat. 952, ch. 646, § 1866, amended by Act of May 24, 1949, ch. 139, § 96(a), 63 Stat. 103, ("Whenever sufficient petit jurors are not available, the court may require the United States marshal to summon a sufficient number of talesmen from the bystanders"), amended by Pub. L. 90–274, § 101, 82 Stat. 58 (Mar. 27, 1968) (current version at 28 U.S.C. § 1866(f) (1988)). The practice of summoning talesmen or bystanders to complete the petit jury when the venire panel had been exhausted was commonly upheld. E.g., St. Clair v. United States, 154 U.S. 134, 147–48 (1894) (no error to summon talesmen where court had dismissed prior venire panel because no more cases were scheduled, and specially summoned panel had been exhausted); Morgan v. Sun Oil, 109 F.2d 178, 180 (5th Cir.) (no error to summon talesmen in advance of

200

actual need because it prevented unnecessary delay, and there was no prejudice in any event), cert. denied, 310 U.S. 640 (1940).

The purpose of the Jury Selection and Service Act of 1968 was to insure that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community . . . ." 28 U.S.C. § 1861 (1988). The House Report on the Act stated that its purpose "is to provide improved judicial machinery for the selection, without discrimination, of Federal grand and petit juries. Its aim is to assure all litigants that potential jurors will be selected at random from a representative cross-section of the community . . . ." House Comm. on the Judiciary, Jury Selection and Service Act of 1968, H.R. Rep. No. 1076, 90th Cong., 2d Sess., reprinted in 1968 U.S. Code Cong. & Admin. News 1792. Accord id. at 1808 (the purpose "is to eliminate discrimination in the selection and service of jurors") (additional views of Rep. R. McClory and Rep. C. Wiggins). Thus, the statute was a prophylactic measure designed to insure that jury selection would be consistent with constitutional requirements. See Castaneda v. Partida, 430 U.S. 482 (1977) (selection of jury to exclude minorities violates equal protection); Norris v. Alabama, 294 U.S. 587 (1935) (same); Strauder v. West Virginia, 100 U.S. 303 (1880) (same). See also Duren v. Missouri, 439 U.S. 357 (1979) (jury venire must be drawn from fair cross section); Taylor v. Louisiana, 419 U.S. 522 (1975) (same); Glasser v. United States, 315 U.S. 60 (1942) (same). The statutory requirements were not, in and of themselves, constitutionally mandated.

The unauthorized manner of supplementing the venire employed in this case was only a technical violation of the statute. 28 U.S.C. § 1866(f) (1988) allows the court to direct the marshal to summon a number of petit jurors at random from the voter registration list. In the instant case, it appears that the trial judge did not require that those summoned be registered voters. Transcript (September 23, 1981) at 371. See Rosado, 699 F.2d at 124, cert. denied, 464 U.S. 832 (1983). Thus, the only apparent difference between the jury actually selected and the jury to which Benjamin was entitled under the statute was that there may have been some jurors—how many, if any, is a matter of pure conjecture[2]—who were not registered voters. Ben-

----

[2] The record does not disclose which, or how many, of the 12 jurors and six alter-

jamin does indicate how this oversight deprived him of a randomly selected jury. The orders specifically directed the marshal to collect talesmen at random. The sheer number of people summoned to serve in the street sweep, approximately 70 within the course of a single day, indicates that the marshal was not selective; there was no time to be.

▉ The method employed was not a substantial violation of the Act. See United States v. Bearden, 659 F.2d 590, 602–03 (5th Cir. Unit B 1981), cert. denied sub nomine Northside Realty Assoc., Inc. v. United States, 456 U.S. 936 (1982). Nothing in the record suggests that the jury was not drawn from a fair cross section of the community. Scott v. Dugger, 891 F.2d 800, 804 (11th Cir. 1989) (citing Duren v. Missouri, 439 U.S. 357 (1979)). Likewise, Benjamin's suggestion that jurors were biased because they were threatened with imprisonment if they did not serve has no merit. The trial judge excused a significant number of the members of the panel to attend to family matters.

Benjamin is unable to show that Attorney Day's failure to object was objectively unreasonable when the violation of the statute was not substantial. Selecting a jury is "more an art than a science," and a reviewing court's evaluation of whether a trial attorney was ineffective necessarily recognizes this reality. Romero v. Lynaugh, 884 F.2d 871, 878–89 (5th Cir. 1989), cert. denied, 110 S. Ct. 1311 (1990). To be effective within the meaning of Strickland, an attorney need not anticipate changes in the law,[3] Horne v. Trickey, 895 F.2d 497, 499–500 (8th Cir. 1990) (counsel not ineffective for failing to claim

---

nates were selected from the street sweep. See Transcript (September 23, 1981) at 365–499. On direct appeal, the Third Circuit noted that the trial judge had initially ordered a panel of 94 persons summoned from the qualified jury wheel. Rosado, 699 F.2d at 123, cert. denied, 464 U.S. 832 (1983). Another one hundred names were then drawn. Id., cert. denied, 464 U.S. 832 (1983). On September 22, 1981, Chief Judge Christian ordered that the marshal summon forthwith a panel of fifty jurors. When this failed to provide a sufficient number to select a petit jury, Judge Christian ordered the marshal to "select at random thirty (30) persons wherever they may be found to serve as veniremen, and that this order be executed forthwith." Crim. No. 81-79 Docket Entry 85. Later that day, Judge Christian ordered the marshal to select another 40 persons at random. Crim. No. 81-79 Docket Entry 86.

[3] No reported case discusses the remedy, if any, for a violation of the Plan for Random Selection of Jurors of the District Court of the Virgin Islands, V.I. Code Ann. tit. 5, App. V Rules 61–77 (1982). Counsel was not ineffective for failing to press an argument that would have been, and would still be, novel.

202

constitutional violation in jury selection in anticipation of Batson v. Kentucky, 476 U.S. 79 (1986)), and need not pursue constitutional claims of dubious merit. Lancaster v. Newsome, 880 F.2d 362, 374–75 (11th Cir. 1989) (counsel not ineffective in failing to object to jury composition where he believed the method of selection was constitutional).[4] Here, it is not at all clear, even today, that the error in the method employed for selecting the jury rises to the level of constitutional magnitude. The other defense lawyers did not object. Accordingly, Attorney Day's conduct has not been shown to fall below the standard required by the Sixth Amendment.

■ It is unlikely that the failure to object to the composition and selection of the jury had an impact on the outcome of the trial. Benjamin was free to use his six peremptory challenges to remove any of these jurors. He was also free to object to any of the jurors for cause. Moreover, any objection would, in all likelihood, have resulted only in delay as the district court complied with the statutory procedure for summoning members of the venire panel, see 28 U.S.C. § 1866(f) (1988); it seems unlikely that there was any tactical advantage to gain. Benjamin has not shown that he was either prejudiced by counsel's failure to object or that the failure to object was an unprofessional error. See Murray v. Carrier, 477 U.S. 478, 487–88 (1986) (defendant bound in habeas corpus proceeding by counsel's failure to follow procedural rule, whether consciously or because of failure to recognize possible claim, so long as counsel is not ineffective within the meaning of Strickland); Jones v. Barnes, 463 U.S. 745, 751 (1982) (defendant has no right to have counsel press all non-frivolous issues on appeal). Accordingly, Benjamin is not entitled to relief on this ground.

C. *Failure to Request Continuance to Prepare:*

On September 18, 1981, Attorney Day filed a motion for a continuance. That motion asserted that the government had failed to dis-

---

[4] Government of the Virgin Islands v. Forte, 865 F.2d 59 (3d Cir. 1989), which held trial counsel ineffective for failing to preserve a Batson objection, is distinguishable. The critical fact in Forte was that the trial attorney had failed to honor the defendant's "quite reasonable request that she make an objection to preserve [defendant's] rights under a case then pending in the Supreme Court." Id. at 63. The court explicitly stated that "our holding is very narrow and this opinion should not be broadly read." Id. There is no claim that Benjamin requested Attorney Day to make an objection, and there was no case pending in the Supreme Court that related to this issue.

close certain information needed to prepare the defense. Attorney Day also asserted that it would take at least a week to prepare after the disclosure. The trial judge denied the motion by order dated September 21, 1981 because it was not accompanied by a brief as required by Rule 6(e) of the Rules of the District Court of the Virgin Islands. V.I. Code Ann. tit. 5 App. V, Rule 6(e). The transcript of the argument on the motion also discloses that the trial judge denied the motion because Attorney Day had waited until the day the jury selection was to commence rather than raising the issue earlier. The trial judge was clear, however, that appropriate sanctions, including vacating any convictions, would be imposed if it were shown that the government had not disclosed exculpatory evidence. Transcript (September 21, 1981) at 14–15. Benjamin now claims that counsel was ineffective for failing to comply with the local rule.

■■ Benjamin fails to indicate what prejudice flowed from Attorney Day's failure to comply with the local rules. He points to no specific instance of ineffectiveness from inadequate preparation. The court's independent review of the complete transcript of the trial proceedings indicates that Attorney Day was well-prepared. Mere allegations that a trial attorney was ill-prepared do not suffice to raise an issue as to counsel's ineffectiveness.

The court has examined the 1,678 pages of trial transcript. That review has revealed that Attorney Day had a theory of the case, was able to discredit several government witnesses, had reviewed several reports before the trial, and made several strong legal arguments that reflected a thorough understanding of the issues presented. Attorney Day was effective in his representation of Benjamin at trial.

### 2. Due Process Violations:

■ A. Denial of Continuance:

Benjamin is unable to show prejudice from Attorney Day's failure to comply with the local rules in seeking a continuance. He is likewise unable to show such prejudice from the denial of the continuance that there was a "'fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

### B. Failure to Disclose:

Benjamin appears to claim that the government did not disclose the following pieces of evidence, all in violation of the due process

clause: (a) witness statements and addresses as they related to where and when they saw Benjamin; (b) testimony of Clinton Todman, which would have shown that government witness Dion Williams lied; (c) testimony of Carmen Williams whose testimony was "exculpatory to the Government's case," Brief of Benjamin in Support of Motion to Vacate and Set Aside Sentence (Filed March 13, 1983) at 13; (d) testimony of Maude Isaac which was exculpatory; (e) the testimony of Mustolia Williams which would have shown that Miguel Delamos perjured himself, and that the government had attempted to bribe her; (f) the testimony of Jasime Crooke that the police had attempted to bribe her; (g) the testimony of Mahlon Venzen that he had seen Benjamin at 8:00 a.m. on the day of the shooting; (h) the testimony of Irvin George and Eric Thomas that Benjamin worked with materials that appear on a neutron activation analysis.

■ Due process requires that the state disclose evidence which is material either to guilt or punishment. Brady v. Maryland, 373 U.S. 83 (1963). Impeachment evidence falls within the Brady rule. Giglio v. United States, 405 U.S. 150, 154 (1972). A constitutional error occurs where the government has failed to disclose information that might have been helpful in cross-examination, and the conviction must be reversed "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." United States v. Bagley, 473 U.S. 667, 678 (1985). Cf. Strickland v. Washington, 466 U.S. 668, 695 (1984) (citing United States v. Agurs, 427 U.S. 97, 104, 112–13 (1976)).

Benjamin's contentions do not undermine confidence in the outcome of the trial. Although the government did not disclose a list of witnesses until September 21, 1981, Benjamin cannot show substantial prejudice from the delay in disclosure. Attorney Day had already discovered some of the witnesses by his own investigation. Transcript (September 16, 1981) at 12. Although the government knew of some of the witnesses' addresses, in other cases the government did not have the addresses. Transcript (September 21, 1981) at 13. The trial court was not hesitant to disallow evidence offered by the government when that evidence had not been disclosed. Transcript (September 25, 1981) at 275–77 (suppressing evidence of Blyden's prior felony conviction because government had not disclosed it in omnibus pretrial hearing).

Benjamin suggests that the government withheld information that would have undermined its case. These contentions are vague and

conclusory, and lack merit. Benjamin makes no showing that the government knew that Clinton Todman is not his cousin. As discussed below, however, whether Todman was or was not his cousin had little or no bearing on the verdict. Benjamin makes no suggestion as to the manner in which the testimony of Carmen Williams and Maude Isaac would have resulted in a different outcome. Thus, there is no showing that the allegedly non-disclosed evidence is material.

It is equally immaterial that the government allegedly attempted to bribe Mustolia Williams since she was not a witness. Benjamin asserts that her testimony would have shown that Delamos had lied. Delamos testified that he saw Mustolia Williams standing in the street when he witnessed the shooting. Transcript (September 24, 1981) at 109. Benjamin does not indicate in what manner she would have shown that Delamos was lying. It is possible that she would testify that she was not there. If this were the extent of her testimony, it would have made no difference, for Delamos was not the only witness to place Benjamin at the scene of the shooting. She could also state that she was there and did not see Benjamin there; this would merely duplicate the thrust of Benjamin's alibi defense, and it might have undermined Delamos' identification. Even assuming that the government knew of this testimony and failed to disclose it, the absence of more specific showing of what the non-disclosed testimony would have been, the court is unable to conclude that the testimony was material, or that it would have made a difference in the outcome of the trial. The court is not willing or able to grant relief on the basis of speculative conjecture.

The other testimony to which Benjamin refers would merely replicate other testimony presented at the trial. Benjamin presented several witnesses who placed him far away from the alleged shooting. The jury was not convinced of the alibi. That Benjamin would now be able to offer Mahlon Venzen as another alibi witness to testify that Benjamin was not near the scene of the shooting at 8:00 a.m. is of little import. The shooting occurred at about 7:00 a.m., and Benjamin's alibi witnesses testified that they saw him at 7:15, and at approximately 7:30 and 7:40. One more witness who claims to have seen Benjamin at 8:00 a.m. does not undermine confidence in the outcome of the trial.

Benjamin finally contends that the government failed to disclose that he worked with materials that appear on a neutron activation analysis. Initially, the court notes that Benjamin presents no

evidence that he did actually work with such materials. Further, Attorney Day argued in closing that the residues that tested positive on Benjamin's hands could have come from something other than a gun; Attorney Day even suggested that the residue might come from materials he came in contact with at his place of employment. Transcript (September 26, 1981) at 55. Benjamin has not shown that the government in fact knew of the alleged evidence. Moreover, he is unable to show that he was taken by surprise by the alleged suppression of the testimony as he was free to investigate the materials with which he came in contact with in the course of his employment.

C. *Misidentification by Witnesses at Trial:*

 Benjamin claims that two government witnesses misidentified him at trial. Dion Williams identified Benjamin as being in the car outside the victim's apartment building at about the time of the murder. Williams initially had failed to identify Benjamin, but was able to identify him when recalled to the stand by the government. Alvin Fahie also misidentified Benjamin. Transcript (September 24, 1981) at 329. In the absence of any claim that the prosecution knew of the alleged perjury, there is no basis for a § 2255 claim. United States v. Conzemius, 611 F.2d 695, 697 (8th Cir. 1979). Even if Williams did perjure himself, and even if the prosecutor did know that Williams' testimony was false, this alone did not deprive Benjamin of a fair trial. See Smith v. Phelps, 455 U.S. 209, 219–20 & n. 10 (1982). Benjamin's trial counsel effectively cross-examined Williams on his inability to identify Benjamin the day before. Moreover, Williams was not the only government witness to place Benjamin at the scene. Cf. Carter v. Rafferty, 826 F.2d 1299, 1307 (3d Cir. 1987) (affirming issuance of writ of habeas corpus where government's non-disclosure was so serious that defendants "were deprived of a vital opportunity to totally discredit the key and only eyewitness to the crime").

D. *Benjamin's Picture:*

Benjamin contends that the government failed to obtain another picture of him for an identification by Marvin Foy, see Brief of Benjamin in Support of Motion to Vacate and Set Aside Sentence (Filed March 13, 1983) at 17. It appears that Benjamin means Arvin Fahie rather than Marvin Foy, who did not appear as a witness at the trial. Fahie did testify, and in fact he misidentified George rather than Benjamin as discussed above. In light of the misidentification, and this court's analysis of the claim of suggestiveness of the photo array,

Benjamin has not shown that the government's failure to obtain a side-view photograph of Benjamin deprived him of a fair trial. Benjamin was free to obtain such a photograph and to show it to Fahie had he wished. There is no showing that the government's failure to obtain such a photograph in any way implicates the due process clause.

E. *Absence of Counsel at Pretrial Lineup:*

■ On direct appeal, Benjamin raised an issue concerning a pretrial identification. It is unclear whether Benjamin claims that he was denied counsel at a pretrial photo array, or whether he asserts that the array was unduly suggestive. If Benjamin's claim is the former, it is without merit. A defendant has no right to have counsel present at a photo array. United States v. Ash, 413 U.S. 300 (1973). The court proceeds on the assumption that Benjamin attacks the identification as unduly suggestive.

At trial, Alvin Fahie testified that he witnessed the shooting. When the car pulled away, he saw one of the men pull off a mask. At trial, Fahie identified defendant Samuel George. The government then elicited testimony that Fahie had been shown a photo array from which he had selected a man with short hair. Apparently, Benjamin was the man in that picture. Thus, Fahie had mistakenly identified George at trial.

Attorney Day objected to the introduction of this testimony as follows:

> [I]t is obvious that Keith Benjamin was the only man in that photo line-up with short hair and that it was not a broad—a broad question like we thought at the hearing the other day [—] could you identify any of a bunch of people. It was a specific person that he claimed he could identify[,] a man with short hair. They gave him the six-photo spread, and Mr. Benjamin was the only person that spread was shown, and what just happened has been indicative of how ridiculous the photo show was.

Transcript (September 24, 1981) at 330. Moments later, the following exchange occurred:

> Question: Before you pick out the photo, did the detective tell you anything about any of the men or suggest in any way which photograph you should select?
>
> Answer: No, sir.

Transcript (September 24, 1981) at 331. The only possible basis for claiming an unduly suggestive identification was the photographs

208

themselves; the critical question was whether Benjamin's photograph in some way set him apart from the others.

The trial judge overruled the objection to the identification in this manner: "I still do not see anything unduly suggestive about the line-up, and I'm going to permit him to look at it." Transcript (September 24, 1981) at 331. On direct appeal, the Third Circuit found the argument had no merit. Rosado, 699 F.2d at 122, 123 & n.1, cert. denied, 464 U.S. 832 (1983). Benjamin offers no new facts or arguments as to why this court should reach any different conclusion.

Fahie testified at trial that he saw a man in the car with "the hair like slicked back, but the locks ain't too long." Transcript (September 24, 1981) at 329. Benjamin was the only person with short hair in the photo array. Government Exhibit 17, Picture No. 2. This was somewhat suggestive. Yet one other man pictured had relatively short hair, and his hair does appear to be in locks in the back. Government Exhibit 17, Picture No. 6. If the array was designed to highlight one photograph as the man Fahie described, it was the picture with the number 6 on the back.[5]

The alleged suggestiveness as to Benjamin's photograph is also undermined by the suggestiveness of the other photographs. One photo shows a man with a sign stating "Police Dept, St. Thomas VI, 8001620" around his neck. This photograph strongly suggests that this man had been arrested. None of the other photographs contained a similar sign. Another photograph has numbers written in blue pen on the front; this likewise suggests some sort of police arrest code. Moreover, these two photographs were smaller in size than the others, and none of the other photographs had such numbers.

■ The prejudice from the suggestiveness of the photo array is itself undermined by Fahie's misidentification of George at trial. Transcript (September 24, 1981) at 329. See Government of the Virgin Islands v. Blyden, Crim. No. 81-79 (D.V.I. April 3, 1985) slip op. at 15. Whatever taint was created by the suggestiveness of Benjamin's photograph was dissipated by the misidentification at trial. Attorney Day brought the unreliability of the identification to the attention of the jury. Transcript (September 25, 1981) at 134–37. Any

---

[5] Fahie had also described the man he had seen as five feet and six inches tall. Transcript (September 24, 1981) at 329. The man in picture number 6 stands approximately five and a half feet tall, while Benjamin's picture, picture number 2, suggests that he is over six feet tall.

209

error in the identification procedure was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18 (1967). See Rose v. Clark, 106 S. Ct. 3101, 3106 (1986).

F. *Prejudicial Closing Remarks:*

Benjamin asserts that the prosecutor's comments at closing argument to the effect that he had planted memories in the minds of his alibi witnesses deprived him of due process. The prosecutor's closing argument was as follows:

> He knows he is suspected because his hands have been swabbed. First of all, he himself knows he did it, so he is beginning to form his alibi, so he takes advantage of poor little Miguel, but Miguel doesn't remember what time he goes to school. He knows that school begins at 8:30, but he doesn't remember what time he got to school that day, but he remembers that he sold him a newspaper at 7:15 because Mr. Benjamin planted it in his mind. He said, Miguel, you remember selling me a newspaper at 7:15 that morning.

Transcript (September 26, 1981) at 21.

Benjamin has not shown that the alleged misconduct was so serious as to violate due process. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor .... [T]he aim of due process "'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.'" Smith, 455 U.S. at 219 (quoting Brady v. Maryland, 373 U.S. 83, 87 (1967)). Further, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985).

The trial judge found this was perfectly legitimate argument. Government of the Virgin Islands v. Blyden, Crim. No. 81-79 (D.V.I. April 3, 1985) slip op. at 13–14. The only apparent reason to reach any other conclusion is that the statement may have been a comment on evidence not in the record. See J. Lawless Prosecutorial Misconduct § 9.22 (1985 & Supp. 1988). The prosecution had presented several witnesses who placed Benjamin at the scene of the murder at about the time of the murder. The defense presented witnesses who placed him elsewhere. The prosecutor was entitled to

argue that Benjamin had created the memory of his alibi in his witnesses' memory because there was such evidence in the record. Transcript (September 25, 1981) at 313 (Michael Venzen testified "Keith had asked me if I could remember what time I had delivered a paper to him"); id. at 363–64 (Ira Smith testifies that Benjamin "come and investigate me the same day of the incident, and ask me if I recall seeing him up there on the hill"). See id. at 354–55 (Randy Donovan and Benjamin talk about talking on the morning of the shooting).

### 3. Miscellaneous Errors:

#### A. Confrontation:

█ Benjamin argues that he was denied his right to confront witnesses against him when Dion Williams testified that Clinton Todman was Benjamin's cousin.[6] Benjamin claims that he has no cousin named Clinton Todman, that this statement was hearsay, and that he was prejudiced because false testimony went to the jury.

With respect to this issue, the trial judge stated that "while the record is insufficient to determine the end to which this evidence was offered, and is therefore inadequate to determine whether the challenged testimony constitutes hearsay, said testimony is clearly so collateral that its admission could not possibly implicate any substantial right of defendant Benjamin." Government of the Virgin Islands v. Blyden, Crim. No. 81-79 (D.V.I. April 3, 1985) slip op. at 14. It appears that the evidence was offered to show that Williams knew Benjamin, because he had discussed Benjamin with Todman. Thus, the statement was not hearsay. If this was the purpose of introducing this statement, it was undermined by Williams' inability to identify Benjamin at trial. Transcript (September 24, 1981) at 329. But cf. Transcript (September 25, 1981) (Williams recants and identifies Benjamin).

Fed. R. Evid. 103(a)(1) requires an objection be placed on the record to preserve an assignment of error. Benjamin has the burden of showing that he has complied with all procedural requirements, and

---

[6] The testimony at issue was as follows:
> Q. Do you know if he's related to Clinton Todman, the person you picked up.
> A. Yes.
> Q. You know he's related?
> A. That's what Clinton told me.

Transcript (September 24, 1981) at 235–36.

211

he has not shown compliance here. Benjamin likewise has failed to show, as he must, cause for and prejudice from the procedural default. United States v. Frady, 456 U.S. 152, 168 (1982). Thus, this claim must fail. See Diggs v. United States, 740 F.2d 239, 243–44 (3d Cir. 1984) (discussing Frady).

B. *Jencks Act Disclosure:*

■ Benjamin asserts that the prosecutor's refusal to provide Jencks Act statements to Attorney Day until the morning of trial warrants collateral relief. The Jencks Act does not require disclosure until after the government witness has testified. 18 U.S.C. § 3500(a) (1988); id. § 3500(b). United States v. Taylor, 802 F.2d 1108, 1118 (9th Cir. 1986), cert. denied, 479 U.S. 1094 (1987); United States v. White, 750 F.2d 726, 729 (8th Cir. 1985). See United States v. Higgs, 713 F.2d 39, 44–45 (3d Cir. 1983), cert. denied sub nomine Kemp v. United States, 464 U.S. 1048 (1984); United States v. Allain, 671 F.2d 248, 255 (7th Cir. 1982). Benjamin's claim fails to show a violation of the Jencks Act. The timing of the disclosure did not deprive Benjamin of a fair trial. Attorney Day was free to visit the apartment complex where the victim was killed prior to trial.

## III. CONCLUSION

■ For the foregoing reasons, Benjamin's application to vacate or set aside his sentence must be denied. An appropriate order will be entered.

## ORDER

This matter having come before the court on the application of defendant Keith Benjamin to vacate or to set aside his sentence pursuant to 28 U.S.C. § 2255 (1988); and

The court having carefully reviewed the submissions of the parties, and the trial transcript; and

For the reasons set forth in the court's opinion of this date;

IT IS on this 14th day of May, 1990 hereby

ORDERED THAT defendant Keith Benjamin's application is DENIED.